

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-2006

# Medina v. DiGuglielmo

Precedential or Non-Precedential: Precedential

Docket No. 05-3147

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Medina v. DiGuglielmo" (2006). *2006 Decisions*. Paper 486.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/486

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-3147
_____

JOSE MEDINA

v.

DAVID DIGUGLIELMO;
THE DISTRICT ATTORNEY OF THE
COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA,

                                   Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 04-cv-00128
(Honorable Anita B. Brody)
_____

Argued April 27, 2006

Before:  SCIRICA, *Chief Judge*,
NYGAARD and ALARCÓN,[*] *Circuit Judges*.

(Filed August 31, 2006)

Thomas W. Dolgenos, Esquire (Argued)
J. Hunter Bennett, Esquire
Ronald Eisenberg, Esquire
Arnold H. Gordon, Esquire
Lynne Abraham, Esquire
Office of District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499
        Counsel for Appellants

Shannon S. Quill, Esquire (Argued)
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA 19103
        Counsel for Appellee

---

[*]The Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

———————

OPINION OF THE COURT

———————

ALARCÓN, *Circuit Judge*.

David Diguglielmo, the District Attorney of the County of Philadelphia, and the Attorney General of the State of Pennsylvania ("the Commonwealth") appeal from the order granting habeas corpus relief to state prisoner Jose Medina pursuant to 28 U. S. C. § 2254(a) (1994).

Mr. Medina was convicted in a Commonwealth Court of first degree murder and sentenced to life imprisonment. In ruling on his federal habeas corpus petition, the District Court concluded that Mr. Medina's trial counsel provided ineffective assistance because he failed to object to the competency of a twelve-year old witness. The District Court concluded that the state court's decision upholding Mr. Medina's conviction was an unreasonable application of clearly established federal law.

The Commonwealth contends that the District Court "erred in concluding that every reasonable attorney would have challenged Marcos Toro's competency at trial."[1] It also maintains that Mr. Medina "was not prejudiced by counsel's decision not to challenge Marcos's competency." We will

———————

[1]The witness indicated at trial that he also was known as "Michael."

3

reverse the District Court's order because Mr. Medina has failed to demonstrate that he was prejudiced by his trial counsel's failure to object to Marcos Toro's competency.

# I

## A

At the preliminary hearing in this matter, Marcos Toro testified that during the evening of October 18, 1991, he and his ten-year old brother Hector encountered Mr. Medina in a "Chinese store" at Cambria Street and Mascher Street in Philadelphia. Mr. Medina was known as "Harry." Both boys were familiar with Mr. Medina because he was a friend of their older brother. They saw him on a daily basis. Marcos Toro had known Mr. Medina since he was five years old.

Mr. Medina showed the boys a long-bladed "Rambo" knife. Hector testified that Mr. Medina "was drunk and he said 'Today I am going to kill somebody with this knife.'" The boys then left the "Chinese store" and went to their home, which was one block away. A short time later, Marcos Toro heard Mr. Medina shouting that he was owed forty dollars. Marcos Toro testified that he saw Mr. Medina stab William Bogan in the heart with the same knife he had seen earlier.

On cross-examination, however, Marcos Toro testified that he did not see Mr. Medina stab Mr. Bogan. Instead, he stated that his brother told him he saw the assault. On redirect examination, Assistant District Attorney ("ADA") Ann Ponterio questioned Marcus Toro as follows:

Q.  Before we came in here today, the defendant's sister and mother came up to speak to you; right?"

A.  Yes.

Q.  And they made you nervous, didn't they?

A.  (Witness shakes head)

Q.  Did you tell me they scared you?

A.  Yes.

Q.  They are here in the courtroom and they are staring in your direction [from the] back row?

A.  A-huh.

Q.  Are [sic] do they make you nervous now that you are binding your hands?

A.  (Witness shakes head)

ADA Ponterio: [Indicate nodding his head up and down.]

Following this colloquy, Judge Charles J. Margiotti ordered the removal of Mr. Medina's family from the courtroom.  After the family was removed, ADA Ponterio continued her redirect examination.  In response to her questions, Marcos Toro testified that he saw Mr. Medina stab Mr. Bogan once and then dig through his pockets.

On recross-examination, defense counsel, O. Robert Silverstein, asked Marcos Toro whether he saw Mr. Medina stab Mr. Bogan.  Marcos Toro replied: "Yes."

ADA Ponterio then questioned Marcos Toro as follows:

Q.  Now, is what you are telling the judge the truth?

5

> A. Yes.
> Q. Do you know the difference between the truth
> and a lie?

Before the witness could answer the question, Judge Margiotti stated: "I am satisfied he is precocious. He is a very bright boy."

Mr. Silverstein did not move for a competency hearing based on Marcos Toro's age, or his inconsistent responses to the questions posed during direct and cross-examination, nor did he object to Judge Margiotti's *sua sponte* finding that Marcos Toro was "precocious."[2] Judge Margiotti determined that the Commonwealth had presented a *prima facie* case. He ordered that Mr. Medina be held for trial.

## B

Mr. Medina was represented at his trial by Edward Daly. Judge Juanita Kidd Stout presided over the trial. Before the jury was sworn in, Assistant District Attorney Carol Sweeney informed the court in an in-chambers conference as follows:

> Today, he and his brother Hector, Michael
> now being 12, Hector now being 11, were sitting
> in the anteroom looking, in my opinion,

---

[2]When pertaining to a person, the term "precocious" is defined in the Oxford English Dictionary as follows: "Prematurely developed in some faculty or proclivity." *Oxford English Dictionary* (2d ed. 1989).

somewhat nervous about testifying as you might expect from children, but composed and under control until the defendant's family arrived and when his mother, meaning the defendant's mother, walked by and sat in the courtroom and the defendant's sister and when the defendant's brother, I believe it is his brother, a young man about the same age began milling around in the area outside the anteroom.

Michael Toro began to cry, and really lost his composure and said he was very nervous about testifying. The impression I got from the police that is, what I was supposedly told by the police and the officers are right here to relate to it, that is he is afraid to testify, his family fears some kind of retaliation. I am not saying they were justified in fearing that. I am not asking for any instruction. There has been no problem, but I ask you, during Michael's testimony and possibly during Hector, although Hector was not an emotional person, Michael was, to ask the defendant's family to remain outside.

Judge Stout asked Mr. Daly if he had seen Marcos Toro cry. Mr. Daly replied: "I saw the child cry this morning." Mr. Daly stated further that he had no objection to excluding Mr. Medina's family. He also noted that "they would be sequestered anyway" because they would be testifying during the trial.

7

Judge Stout granted the motion.

ADA Sweeney began her direct examination of Marcos Toro by questioning him about his age and whether he knew the difference between telling the truth and telling a lie as follows:

Q. How old are you?
A. 12.
Q. What grade are you in?
A. Five.
Q. You are in the fifth grade. Is that right?
A. Yes.
Q. Do you know what it means to tell the truth?
A. Yes.
Q. What does it mean?
A. (No response.)
Q. Let me ask it the other way. Do you know what it means to tell a lie?
A. No.
Q. Do you know the difference between telling the truth and telling a lie?
A. No.
Q. You just told the jury and the judge when you put your hand on the Bible you were going to tell the truth?
A. Truth.
Q. What does the truth mean?
THE COURT: First of all, let's sit up straight and take your hand down. What happens to you if you

8

tell a lie?

(No response.)

THE COURT: What happens to you? Take your hand down and look at me. Tell me what will happen to you if you tell a lie?

(No response.)

BY MS. SWEENEY:

Q. Do you want to be here, Marcos? I said, do you want to be here?

A. No.

MR. DALY: I object.

THE COURT: Overruled.

BY MS. SWEENEY:

Q. Are you afraid?

MR. DALY: Objection, Your Honor?

THE COURT: Overruled.

THE WITNESS: Yes.

THE COURT: Now, listen, take your hand down.

MR. DALY: Your Honor will note my objection for the record.

THE COURT: Your objection is well noted.

Sit up straight: Pretend you are at home or at school, or someplace and talk to us just like you would talk to the teacher.

Now, let's start over again.

Tell me what will happen to you if you tell a lie? What would the teacher – what would your mother do to you? What would your father do to

you?  What would happen to you[?]

BY MS. SWEENEY:

Q.  Marcos, you have to give an answer if you know the answer.  What would happen to you if you tell a lie?  Do you get rewarded?

A.  No.

Q.  Do you get a prize for telling a lie?

A.  No.

Q.  Do you get in trouble for telling a lie?

A.  Yes.

Q.  What about when you tell the truth?  If you tell the truth, is that a good thing to do?

A.  No.

THE COURT: It is not good to tell the truth?

THE WITNESS:  Yes.

THE COURT: Now, sit up straight and hold your head up.

MS. SWEENEY: Sit back.  Nobody is going to hurt you.  Sit back.  If you want some water, if you want a kleenex or if you say, "Boy, I need a break." you just let us know.  All right?

THE WITNESS: Yes.

BY MS. SWEENEY:

Q.  We want you to tell the truth about what you may have seen and heard about a year ago involving the white dude.  Do you know what I am talking about?

A.  No.

10

MR. DALY: I object to the leading nature of the question.

THE COURT: Overruled.

You don't know what she is talking about?

THE WITNESS: No.

THE COURT: All right.

After hearing the testimony quoted above, Mr. Daly did not object on competency grounds. ADA Sweeney proceeded with her direct examination. Marcos Toro testified that he saw Mr. Medina in a "Chinese store." He stated he had known Mr. Medina since he was five years old. He had seen Mr. Medina every day in the neighborhood. When asked to tell the jury "[w]hat happened after Mr. Medina entered the store," Marcos Toro did not answer. ADA Sweeney then requested a sidebar conference, which was granted. She informed Judge Stout that ADA Ponterio had handled the preliminary hearing and knew the witness better than she did. ADA Sweeney requested that ADA Ponterio question Marcos Toro. Judge Stout replied: "If he testified at the [preliminary] hearing and you have the notes,[3]

---

[3]In Pennsylvania, the transcript from a pretrial hearing in municipal court is referred to as "notes from an examination." *See, e.g.*, 42 Pa. Cons. Stat. § 5917 (2000) (providing that "[w]henever any person has been examined as a witness, . . . in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine, if such witness afterwards dies, . . . or if he becomes incompetent to testify for

11

I think he can be declared an unavailable witness." Mr. Daly objected to permitting a second lawyer to continue the direct examination of Marcos Toro. ADA Sweeney then requested the Court's permission to seat ADA Ponterio at counsel table. Judge Stout inquired whether the prosecutor could put on another witness. ADA Sweeney replied: "He won't be any better tomorrow." Judge Stout permitted ADA Ponterio to sit at counsel table.

ADA then resumed her examination. Marcos Toro testified that Mr. Medina showed him and Hector Toro a "Rambo" knife. After leaving the "Chinese store," Marcos Toro went home. He testified that he saw Mr. Medina stab a white man in the chest. He also testified that he did not see "anyone go over to the white man after he fell down."

When ADA Sweeney showed Marcos Toro a copy of his interview with the police, she was asked if he could read. Marcos Toro did not reply. When Marcos Toro was asked if he signed the statement, he replied that he signed his name on every page. ADA Sweeney asked Marcos Toro to read the statement. Judge Stout then declared a five-minute recess.

After the jury left the courtroom, ADA Sweeney asked Marcos Toro if he was okay. The witness shook his head and went to the men's room. ADA Sweeney asked a police officer

---

any legally sufficient reason properly proven, *notes of his examination* shall be competent evidence upon a subsequent trial of the same criminal issue" (emphasis added)).

to go into the men's room and then report on Marcos Toro's status.

Judge Stout stated that she had asked a court attache to try to get a doctor to examine Marcos Toro, but none was available. Judge Stout then directed that 911 be called. Judge Stout reconvened the trial after thirty-five minutes.

Marcos Toro testified that he heard the white man state: "I will pay you tomorrow. I will pay you tomorrow." After the white man fell on the ground, the witness saw Mr. Medina digging in the victim's pockets.

Mr. Daly's cross-examination of Marcos Toro consisted primarily of reading Marcos Toro's inconsistent testimony at the preliminary hearing, as demonstrated by the following:

> Q. Do you remember this question: "In fact, you didn't see Harry stab the guy. Did you? Do you remember that question?"
> A. Yes.
> Q. Your answer: "My brother did." Do you remember that answer?"
> A. Yes.
> Q. Do you remember this question: "Your brother did and you were only telling us what your brother told you is that right?"
> And your answer: "Yes." The answer is "Huh-huh."
> A. Yes.
> Q. Do you remember that question and that

13

answer?

A. Yes.

Q. Do you remember this question: "And you didn't eyewitness Harry do anything. Right? Am I correct? You have to say yes or no."

And your answer: "Yes."

A. Yes.

Q. And you only assumed that because you saw the knife at the restaurant. Is that right?

A. Yes.

Q. And you answered: "Uh-uh."

Later, in his cross-examination, Mr. Daly asked Marcos Toro the following questions:

Q. And when [Mr. Silverstein] asked you that question, remember we went over here, when he asked you, "You only assumed that because you saw the knife in the restaurant. Is that right?"

A. Yes.

Q. And when he asked you the question, "Everything you said about Harry stabbing the white dude is either something that your brother told you or you made up because you figured he did it because he had a knife. Right?

A. Yes.

Q. When he asked you that question, you were telling the truth. Weren't you?

A. Yes.

14

Q. And it is not your intention, never was, to tell a lie. Was it?

A. No.

Q. And you believed at the time you were talking to the police that you were helping them?

A. Yes.

Q. Yes?

A. Yes.

Q. And what you told the defense attorney at the time was the truth. Wasn't it?

A. Yes.

Q. You thought from seeing the knife earlier that Harry must have down [sic] it?

A. Yes.

Q. As you told the defense attorney, in fact, you didn't see it. Did you?

A. Yes.

On redirect examination, ADA Sweeney questioned Marcos Toro in the following manner:

Q. Did you make this up?

A. No.

Q. Did you see this stabbing?

A. Yes.

Q. Who stabbed the white dude?

A. Harry.

Mr. Daly didn't ask any further questions, nor did he request that the Court determine whether Marcos Toro's

15

testimony should be excluded because he was not a competent witness.

Mr. Medina was found guilty of first degree murder, robbery, and possessing instruments of crime in connection with the death of Mr. Bogan. The jury deadlocked during the penalty phase. Judge Stout sentenced Mr. Medina to life imprisonment.

## II

## A

On his direct appeal before the Pennsylvania Superior Court, Mr. Medina argued:

> (1) the trial court erred by permitting the testimony of two pre-teenage boys; (2) his counsel rendered ineffective assistance because he did not seek a pre-trial determination of the boys' competency to testify and did not object to their competency during the trial; and (3) the evidence was insufficient and the verdict was against the weight of the evidence.

*Commonwealth v. Medina,* No. 3885, slip op. at 1 (Pa. Super. Ct. Aug. 31, 1995). The Superior Court held the evidence was sufficient to sustain the conviction. *Id.* at 19. The Superior Court summarized the evidence as follows:

> In addition to the identification testimony given by Michael Toro, there was circumstantial evidence tending to connect appellant with the

16

homicide. Not only was appellant present at or near the scene of the stabbing, but he had in his possession a knife similar to that used by the killer and had previously vowed to use it to kill somebody. Finally, there was testimony that he had been observed going through the victim's pockets after the stabbing. Thus, even though the offending knife had not been found and despite the sometimes less than positive identification by Michael Toro, a jury, having found the Commonwealth's evidence credible, could find beyond a reasonable doubt that appellant was the killer.

*Id.* at 19-20.

The Superior Court also held "there is at least arguable merit to appellant's contention that his trial counsel was ineffective for failing to object to the competency of the juvenile, Michael Toro." *Id.* at 20. The Superior Court remanded "for an evidentiary hearing on appellant's claim that he received ineffective assistance of counsel." *Id.* at 24. The Superior Court instructed that "[i]f trial counsel's assistance is found to be effective, the judgment of sentence may be reimposed. If counsel's assistance was ineffective, however, a new trial must be granted." *Id.*

**B**

At the November 22, 1995 evidentiary hearing before

17

Judge Stout, ADA Sweeney called Mr. Daly as a witness.  Mr. Daly testified that he did not object to Michael Toro's competency at trial because, after reviewing the transcript of the preliminary hearing, he concluded that Michael Toro was competent and "decided to wait until the trial to see the demeanor of his brother."  He explained:  "I ran down the criteria that one considers in looking at the competency of a witness."  Mr. Daly testified as follows:

> Well, the individual, did he perceive something; yes, he saw something that was there; did he recall it; he could recall it; did he have the necessary communicative skills; yes, he did; was there any question, did it appear that he understood the oath that he was taking; yes, he appeared to understand the oath.

When asked about the advisability of requesting a competency hearing during trial.  Mr. Daly answered as follows:

> Well, I decided that the individual appeared to me to be competent, and based on the strategy that I wished to use, that is the fact that Michael Toro, in his preliminary hearing notes, seemed to flip-flop, I wanted to have him on the stand to see whether or not he would do the same, which I believed that he, based on the notes testimony, that he would, and he flip-flopped in front of the jury at that time.

18

ADA Sweeney then asked Mr. Daly: "What was your strategy designed to do at trial, in terms of cross-examination of Michael and Hector Toro?"  Mr. Daly answered: "[M]y strategy was if we had Michael Toro up on the stand, to use the preliminary hearing notes against Michael Toro, in order to show the jury that at a prior hearing he had flip-flopped on what he said that he saw."  Mr. Daly also stated that the strategy appeared to work:

> During the trial, the strategy appeared to work, because Michael Toro, in fact, when the prosecution, that is yourself, asked Michael Toro a question, he went with the prosecution. However, when I went up and cross-examined him, he went for the defense, that is, he didn't see what he supposedly saw.  When you stood up again, he said yes, he had seen it.  So, it was bouncing back and forth, and I thought, at that time, the bouncing back and forth was doing what I wanted it to do, that is creating a reasonable doubt.

After the evidentiary hearing, Judge Stout indicated she intended to deny Mr. Medina's claim of ineffective assistance of counsel.  The docket contains a hand written entry that states: "THE DEFENSE MOTION FOR INEFFECTIVE ASSISTANCE OF COUNSEL IS DENIED.  THE DEFENDANT IS GRANTED THIRTY (30) DAYS TO APPEAL TO THE SUPERIOR COURT."  This entry was signed, "Stout" below the words "BY THE COURT."  However,

19

no order was entered by Judge Stout denying the motion. After Judge Stout's death, Judge Legrome D. Davis, now a federal district court judge, issued an order denying Mr. Medina's motion on October 10, 1997.

## C

In Mr. Medina's second direct appeal, the Court of Common Pleas concluded: "[I]t cannot grant defendant relief simply because hindsight reveals that trial counsel's tactical decision that the witness was competent and that he would be able to discredit him through cross examination was in error." *Commonwealth v. Medina,* No. 1080, slip op. at 4 (Pa. Ct. of C.P. Feb. 7, 2000). The Superior Court affirmed that decision on February 16, 2001. *Commonwealth v. Medina,* No. 3132 EDA 1999, slip op. at 3 (Pa. Super. Ct. Feb. 16, 2001) (holding that "[c]ounsel's strategy, while arguably the wrong one in hindsight, was not lacking in a reasonable basis designed to further appellant's interest.").

## D

Mr. Medina filed for relief pursuant to the Post Conviction Relief Act on December 11, 2001. His petition was dismissed by the trial court. The Superior Court affirmed that dismissal on September 17, 2003. *Commonwealth v. Medina,* 835 A.2d 833 (Pa. Super. Ct. 2003). On December 16, 2003, the Supreme Court of Pennsylvania denied Mr. Medina's Petition for Allowance of Appeal. He then initiated this proceeding pursuant to 28 U.S.C. § 2254.

In his pro se brief for habeas corpus relief filed pursuant to 28 U.S.C. § 2254(a), Mr. Medina raised six claims. *Medina v. Diguglielmo*, 373 F. Supp. 2d 526, 538 n.6 (E.D. Pa. 2005). His first three claims alleged "ineffectiveness of trial counsel for failing to object to the competency of the Toro brothers." *Id.* at 538. His fourth claim alleged ineffectiveness of counsel for "failing to introduce medical evidence establishing that Medina was incapable of acting in the manner described at trial." *Id.* Mr. Medina alleged, in his fifth claim, that "the trial court rendered his trial counsel ineffective by admonishing counsel in front of the jury and that appellate counsel was ineffective for failing to raise this issue." *Id.* In his sixth claim, Mr. Medina contended that "the prosecution made improper remarks in its closing argument by vouching for the Commonwealth's witnesses and that appellate counsel was ineffective for failing to raise the issue." *Id.*

Mr. Medina's appointed counsel characterized the pro se petition as containing five claims:

> (1) ineffective assistance of trial counsel for failing to object to the competency of the Toro brothers, (2) violation of Medina's federal due process rights when the trial court failed to conduct a *sua sponte* inquiry into the competency of the Toro brothers; (3) ineffective assistance of trial counsel for failing to introduce medical records; (4) ineffective assistance of counsel for failing to object to improper prosecutorial

21

remarks; and (5) ineffective assistance of trial and appellate counsel in relation to the trial court's admonishments of trial counsel in front of the jury.

*Id.* at 538 n.6.

The District Court noted, however, that the Magistrate Judge's Report and Recommendation ("R&R") "disregards his *pro se* claim that the trial court violated his due process rights when it failed to conduct a *sua sponte* inquiry into the competency of the Toro brothers." *Id.* Because "[t]he parties did not object to the Magistrate Judge's characterization of Medina's claims in their objections, and Medina actually adopted [the Magistrate Judge's] characterization of his claims in his objections to the R&R," the District Court did not consider whether the failure of the trial court to conduct a *sua sponte* competency hearing violated due process. *Id.*

Pursuant to Rule 8(b) of the Rules Governing Section 2254 Cases, a district court is not required to determine *de novo* whether a magistrate judge erred in failing to consider a claim in his or her report and recommendation if no objection was made by a party on that ground. In his brief before this Court, Mr. Medina does not contend that his federal due process rights were violated by the failure of the trial court to conduct a *sua sponte* hearing regarding the competency of the Toro brothers. Furthermore, Mr. Medina did not file a protective cross-appeal challenging the failure of the District Court to consider his federal due process claims. *See Henderson v. Carlson*, 812 F.2d

22

874, 877-79 (3d Cir. 1987) (holding that "the failure of a party to object to a magistrate's legal conclusions may result in the loss of the right to *de novo* review" in the district court – but not in the loss of the statutory right to appellate review). Accordingly, we conclude that this claim has been abandoned or forfeited.

The District Court entered a final order on June 2, 2005, granting Mr. Medina's petition for habeas corpus relief. It concluded that the state court's dismissal of his claim that his trial counsel was ineffective for failing to object to the competency of Marcos Toro was an unreasonable application of clearly established federal law. *Medina,* 373 F. Supp. 2d at 549. The District Court also concluded that the failure of Mr. Medina's trial counsel to object on competency grounds was prejudicial because "[a]bsent Marcos's testimony, there is a reasonable probability that the jury would have a reasonable doubt regarding Medina's guilt." *Id.* at 552.

The Commonwealth has timely appealed. This Court has jurisdiction over this appeal pursuant to 28 U.S.C.§ 1291 (1993) and § 2253(c)(i)(A) (Supp. 2006).

### III

### A

The Commonwealth contends that the District Court erred in concluding that Mr. Daly's representation was ineffective for failing to challenge Marcos Toro's competency to testify.

23

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (Supp. 2005).

The Supreme Court instructed in *Williams v. Taylor*, 529 U.S. 362 (2000) that

> [u]nder the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal

24

> habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13. For the writ to issue, the state court's application of federal law must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

Claims of ineffective assistance of counsel are evaluated pursuant to the standard enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984). The standard has two components. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. Regarding prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Of course, the state of the law is central to an evaluation of counsel's performance at trial. A reasonably competent attorney patently is required to know the state of the applicable law." *Everett v. Beard*, 290 F.3d 500, 509 (3d Cir. 2002),

*abrogated on other grounds*, *Priester v. Vaughn*, 382 F.3d 394 (3d Cir. 2004).  "[A] criminal defendant may demonstrate that his representation was constitutionally inadequate by proving . . . that his attorney's performance was deficient, i.e., unreasonable under prevailing professional standards . . . ." *United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005).

The law of Pennsylvania concerning the competency of a witness under fourteen years of age was clearly established long before the trial in this matter in *Rosche v. McCoy*, 156 A.2d 307 (Pa. 1959).  *See Everett*, 290 F.3d at 510 (discussing status of state law at the time of trial, to evaluate competency of attorney).  In *Rosche*, the Pennsylvania Supreme Court held that "[c]ompetency is the rule and incompetency the exception.  The burden to show incompetency lies upon the party *who asserts it*."  *Id.* at 309 (internal citations omitted) (emphasis added).  In *Rosche*, the Court set forth the rule that must be applied regarding "[t]he question of persons said to be mentally immature due to infancy."  *Id.* at 310.  "[C]ompetency is presumed where the child is more than 14 years of age.  Under 14 there must be a judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity."  *Id.*

The Court in *Rosche* instructed that the following factors must be applied in determining competency:

> [t]here must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent

26

answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering *what it is* that [the child] is called to testify about and (3) a consciousness of the duty to speak the truth.

*Id.*

Although *Rosche* required a judicial inquiry as to mental capacity for a child under fourteen years of age, the burden to disprove competency here rested on the defendant. Trial counsel was ineffective in not requesting a judicial inquiry into competency.

Mr. Daly attempted to justify his failure to object to Marcos Toro's competency on the basis that he concluded the child was competent after reading the transcript of his testimony from the preliminary hearing. Mr. Daly did not move for a competency hearing after Marcos Toro testified that he did not know the difference between telling the truth and telling a lie. This response should have alerted Mr. Daly that because of his *immaturity*, Marcos Toro lacked "a consciousness of the duty to speak the truth." *Id.*

Mr. Daly's excuse for failing to seek a competency hearing during the trial because he "decided that the individual appeared to me to be competent" is baffling. We agree with the District Court that Mr. Daly's performance was objectively unreasonable under the professional standards applicable to lawyers who practice in Pennsylvania courts.

27

Mr. Daly also justified his failure to object to Marcos Toro's competency based on his trial strategy of raising a reasonable doubt by demonstrating that Marcos Toro was not a credible witness because he "flip flopped" in his testimony at the preliminary hearing regarding whether he saw Mr. Medina stab the victim depending on which lawyer asked the question. Mr. Daly's alternative decision not to challenge Marcos Toro's competency because he wanted to discredit the child's testimony on cross-examination was also objectively unreasonable under prevailing professional performance standards in Pennsylvania. In *Commonwealth v. Mangini*, 425 A.2d 734 (Pa. 1981), which was decided eleven years before the trial in this matter, the Supreme Court of Pennsylvania held that a defense counsel's performance under virtually identical circumstances was ineffective. *Id.* at 737. In *Mangini*, trial counsel failed to object to a witness's competency because he chose to discredit him through cross-examination. In concluding counsel's performance was ineffective, the Pennsylvania Supreme Court reasoned as follows:

> This was not a case where counsel had two alternatives that were contradictory or mutually exclusive. In such a case counsel must necessarily choose one or the other alternative. This case presents, instead, the situation where counsel had two alternatives, both of which are available to him. . . . If he succeeded in [disqualifying the witness], there would be no need to pursue the less certain method of

28

> discrediting the witness on cross. . . . There is no reasonable basis under these circumstances, for, [sic] deliberately eschewing one weapon (out of two available) when both can be used.

*Id*. (quoting Superior Court).

Mr. Medina's trial counsel's failure to object to Marcos Toro's competency, under these circumstances, as required by *Rosche* and *Mangini,* fell below an objective standard of reasonableness. *See also Kimmelman v. Morrison*, 477 U.S. 365, 386-387 (1986) (deficient performance of *Strickland* prong satisfied where counsel failed to file a suppression motion due to his ignorance of discovery rules); *Everett*, 290 F.3d at 500, 513-14, (counsel ineffective for failing to object to jury instruction due to lack of knowledge of applicable law).

The Pennsylvania Superior Court failed to cite *Rosche* or *Mangini* in holding that Mr. Daly's strategy "while arguably the wrong one in hindsight, was not lacking in a reasonable basis." *Commonwealth v. Medina,* No. 3132 EDA 1999, slip op. at 3 (Pa. Super. Ct., Feb. 16, 2001). This ruling was an objectively unreasonable application of the Supreme Court's decision in *Strickland* because it failed to consider prevailing professional standards.

**B**

We also reject the Commonwealth's contention that counsel's failure to challenge Marcos Toro's competency was reasonable because Judge Margiotti "ruled that Marcos was

29

competent." (Appellant's Reply Br. at 8.)

It is quite true that Judge Margiotti stated that he was satisfied that Marcos Toro was "precocious" and did not permit the child to respond to the prosecutor's question: "Do you know the difference between the truth and a lie." Under *Rosche*, a Pennsylvania court must conduct a *searching* inquiry of the mental capacity of a child under fourteen. *Rosche*, 156 A.2d at 310. The record does not reflect that a searching inquiry was conducted by Judge Margiotti before he concluded that Marcos Toro was "precocious."

Judge Margiotti's conclusion was unsupported by any findings. Furthermore, when Marcos Toro was asked at trial whether he knew the difference between telling the truth and telling a lie, he testified that he did not know the difference. This response would have caused a reasonably competent lawyer to assert that a hearing should be conducted to determine whether Marcos Toro was competent to testify as a witness.

## IV

We next consider whether Mr. Medina has demonstrated that "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The prosecution presented strong circumstantial evidence of Mr. Medina's guilt. Even without the testimony of Marcos Toro, there was more than sufficient evidence to convict Mr. Medina.

First, Hector Toro testified as follows. He was seven

30

years old when he first met Mr. Medina. On October 18, 1991, Mr. Medina was carrying a "Rambo" knife that was about a total of thirteen inches long, with approximately a five-inch handle. He said: "Today I'm going to kill somebody with this knife." Hector Toro had seen Mr. Medina on almost a daily basis for several years. Thus, mistaken identity was not a viable defense. Hector Toro and his brother stayed in the "Chinese store" about fifteen minutes after encountering Mr. Medina. After they left to return home, Hector Toro heard a noise. He ran a half a block and saw a man lying on the ground.[4]

Maria Caraballo also testified as a prosecution witness. Her home was a few houses away from the residence of Marcos

---

[4]At the outset of Hector Toro's testimony the prosecutor asked him how old he was. He replied: "Eleven." The prosecutor then asked him to define the words "truth" and a "lie," and to explain what happened to persons who tell a lie. The witness defined a lie as follows: "When you don't see or you see when you see nothing and you tell then you see it." Mr. Daly did not request a competency hearing regarding Hector Toro's competency.

The Magistrate Judge stated in his report and recommendation that there was no basis to question Hector Toro's competency. Mr. Medina's habeas corpus counsel did not object to this finding. The District Court adopted Judge Hart's finding on the competency of Hector Toro. No issue has been raised in this appeal concerning Hector Toro's competency.

and Hector Toro.  As she was seated on her steps sewing at 9:15 p.m. or 9:30 p.m., she saw a white man run down the street holding his chest.  She followed him to render aid but did not find him.

When she returned to her home, she saw Mr. Medina bending over a car.  He appeared to be looking for something under the car.  A woman came up to Mr. Medina and held him down.  He appeared to be mad.  She tried to calm him.  Ms. Caraballo saw Mr. Medina get "loose from the lady."  She then heard a boy say they found a dead person at the corner.  Ms. Carabello went to the corner and recognized Mr. Bogan as the man who ran past her.

Next, Police Officer Robert Fetters testified that he and his partner were working in plain clothes in an unmarked car looking for a crime in progress.  Officer Fetters and his partner had received a report of "a hospital case and person with a knife" wearing a white sweatshirt near the location where Mr. Bogan was killed.  At about 9:34 p.m., Officer Fetters saw Mr. Medina at the nearby intersection of Mutter and Cambria, wearing a white sweatshirt. Officer Fetters stopped Mr. Medina and frisked him.  He was unarmed.

After two minutes, the officers released Mr. Medina because there was no evidence of a "hospital case" or a person with a knife.  During the brief detention, Mr. Medina asked the officers why they had stopped him.  They explained that they had a report of a man in a white sweatshirt.  He volunteered that he had money in his hand because he was putting it in a birthday

card for a friend's daughter. Mr. Medina walked away with three males who had been standing on the corner. Mr. Medina walked with them to a bar at Mutter and Cambria. Officer Fetters proceeded to the nearby intersection of Hope and Gurney, where he saw a police vehicle and a rescue unit. Officer Fetters then saw a man lying in the street.

Officer Fetters and his partner went back to the bar at Mutter and Cambria. When they entered, they saw Mr. Medina. Mr. Medina had taken off his white sweatshirt. He had rolled it up in a ball in his hand. There were no bloodstains on the sweatshirt. The jury could have reasonably inferred from the removal of the sweatshirt, however, that he was attempting to avoid detection by officers investigating the police report of a "hospital case" and a man in a white sweatshirt carrying a knife.

Additionally, Police Officer Thomas Grieco testified that he and his partner responded to a police dispatcher call in the vicinity of Hope and Gurney Streets in Philadelphia. He searched for a weapon or other evidence on Mutter Street. A group of young boys, including Marcos and Hector Toro assisted his search by pointing out a trail of blood. With their assistance, Officer Grieco found Mr. Bogan's body.

Next, Police Officer Eugene Harris testified that as he and his partner were proceeding west on Gurney Street, they were confronted by a group of young males, including Marcos and Hector Toro. They stopped his police vehicle and told him there was a man lying on the sidewalk between Hope and Front Streets. Mr. Bogan was lying face down. Officer Harris took

33

Mr. Bogan's pulse. He had none. Mr. Bogan's pockets were pulled out on both sides. He did not have a wallet, and there was no money in his clothing. His driver's license was lying on the small of his back.

Officer Harris's partner summoned a rescue unit. The unit arrived in approximately five minutes. After a search of the area, the officers did not find Mr. Bogan's wallet or the murder weapon.

Finally, Edwin Lieberman, the Assistant Medical Examiner in the County of Philadelphia, testified he performed the autopsy on the body of Mr. Bogan. Mr. Bogan died of a single stab wound to the front of the left side of his chest just above his left nipple. The depth of the stab wound into Mr. Bogan's heart was six inches. The witness opined that the wound was caused by a single edge knife that was approximately six inches in length. Just above the wound site, Dr. Lieberman found a triangular-shaped abrasion which could have resulted from inserting the knife all the way up to the handle. A jury could have concluded that Dr. Lieberman's testimony regarding the length of the blade corroborated Hector Toro's estimation of the blade's length.

Ephraim Torres was the only defense witness. He testified that he had known Mr. Medina for two years prior to October 18, 1991. Mr. Torres invited Mr. Medina to come to Philadelphia to attend a birthday party for the witness's daughter. Mr. Torres also testified that Mr. Medina previously had lived on Mutter Street right by Cambria Street before

34

moving to Reading seven or eight months before the birthday of the witness's daughter. Mr. Torres testified that Mr. Medina had a very good reputation "as a peaceful, law-abiding citizen." Counsel stipulated that if Mr. Medina's mother were called as a witness she would testify that her son had a reputation for being a peaceful and law-abiding citizen.

When informed that Mr. Medina would not testify, Judge Stout advised him that he had a constitutional right to take the stand and testify. Mr. Medina testified that his decision not to testify was voluntary.

The District Court concluded that "[w]ithout Marcos's testimony there is a reasonable probability that the jury would not have convicted Medina. Marcos was the only witness at trial who testified to seeing the actual stabbing." *Medina,* 373 F. Supp. 2d at 551. In so ruling, the District Court overlooked the impact of the other witnesses' testimony. Hector Toro's testimony and the other circumstantial evidence presented by the Commonwealth support a reasonable inference that Mr. Medina carried out his threat to kill someone that day with his "Rambo" knife.

The trial court instructed the jury that "[e]ven though proof beyond a reasonable doubt of the identity of the defendant as the person who committed the crime is essential to conviction, direct evidence of identity is not necessary and a defendant may be convicted merely on circumstantial evidence." The trial court also instructed the jury that it "may take into consideration [a witness's] prior inconsistent statement and

testimony, if any, both as substantive evidence to prove the truth of the matter asserted in the statements and as affecting [the witness's] credibility."  The jury was further admonished that "[t]he mere existence of conflict in the prosecutor's evidence is not fatal to its case because the Commonwealth is not bound by everything its witnesses say, and you the jury can believe all, part or none of the testimony."

Mr. Daly skillfully demonstrated to the jury through his cross-examination that Marcos Toro was not a credible witness because there were serious conflicts in his testimony.  In his argument, Mr. Daly pointed out to the jury that "[t]he only testimony you heard stating that the defendant in this case stabbed him came from Marcos Toro, Michael Toro, the second young man that testified, and that, ladies and gentlemen is not to be believed."  Mr. Daly pointed out to the jury that Marcos Toro's testimony went "[b]ack and forth."  When the prosecutor questioned the witness, he testified: "I did see it."  When cross-examined, however, Marcos Toro testified: "No, I didn't see it. Thus, Marcos Toro's testimony was clearly damaging to the *prosecution's* case because he admitted under oath that he did not see Mr. Medina stab the victim, and that his brother, and not he, had witnessed the crime.

To find Mr. Medina guilty beyond a reasonable doubt, however, the jury was free to disregard Marcos Toro's testimony and to rely on the circumstantial evidence of guilt presented by the other witnesses.  Because of the strength of the circumstantial evidence, including Mr. Medina's statement to

36

Hector Toro that he was going to kill someone with the knife in his possession a few minutes before Mr. Bogan was found stabbed to death nearby, we are persuaded that Mr. Daly's deficient performance was not prejudicial.

## V

We will affirm the District Court's determination that Mr. Daly's performance in failing to request a competency hearing outside the presence of the jury was ineffective. We will reverse the District Court's Order granting habeas corpus relief because we have concluded that Mr. Medina was not prejudiced by his trial counsel's performance.